Case Numbers 17, 3289, 3290, 3297, 3299, 3302, 3304, 3306, 3308, and 3309 United States v. Deonte Ussury et al. Arguments not to exceed 30 minutes to be shared by defendants and 30 minutes for plaintiff. Mr. McKenna, you may proceed for the appellants. Good morning, Your Honors. Good morning. May it please the Court, I'd like to reserve one minute for rebuttal. Very well. Thank you. Your Honors, I'd like to discuss the motion to suppress issue on behalf of Mr. Ledbetter. We have a situation of a Terry stop where the first prong of Terry, was there a proper stop, is not at issue. That was a situation where there was a drug house being observed by a detective. The detective asked some street officers to make a traffic stop when they saw one and they did. This Court has already said that situation is okay. What at issue then is the second prong of Terry and that is was the degree of intrusion reasonably necessary and related to the scope of the situation? And we argue that it was not. The officers approached the car of Mr. Ledbetter or the van after it was stopped, Your Honors, and didn't ask him his name or ask for ID. They said they saw him facing away from them and was nervous and then took him out of the van and patted him down. This Court has ruled previously in U.S. v. Richardson that nervousness is an unreliable indicator of reasonable suspicion. The case that the facts here, I would distinguish because in Bost, the defendant in that situation had hit his hands for some time and the officers lost sight of the defendant's hands. Where here in this situation, the officers always saw the driver's hands. He never made a threatening move to them and they took him out and patted him down. They found some on his person, some cocaine and then subsequently when they searched the van, found a weapon. As you know, Your Honors, any warrantless search is presumed unreasonable and in this case, this search certainly was unreasonable. The situation and facts were beyond the scope necessary to make that stop and to make that search. And that relates to the conspiracy count over Act Number 51 and then the Williams murder counts 9 and 10. How much evidence did this search affect? Well, it affected, in the conspiracy count, it was over Act 51, Your Honor. So it was a small part of... One overt act out of how many? Over 100? It was over 100, Judge. I admit it was a small part, but if it wasn't important, the government wouldn't have put it on. I guess I'm asking about harmless error. I mean, I understand your argument, but this is one out of 100 overt acts? Well, it also affected... Why is it likely to make a difference? It also affected the Rodriguez murder count, Your Honor, on count 9 and 10. There were only four murders. Certainly, the government argued that in the Rodriguez murders, there was, I believe, $60,000 to $70,000 taken, and they argued that the money that was recovered in this search, the $45,000, was part of that. So I would argue that not only does it... I recognize it only affects a small part of the conspiracy, but it would affect counts 9 and 10, the Rodrigo Williams murder counts. How does it affect the murder counts? Has it to do with the amount of money they were trying to get when they murdered him? The government inferred that in its argument that the money that was recovered in the ban was left over from that murder, thus tying Mr. Ledbetter to the murder. I would also like to bring up very quickly, Your Honors, the denial of the mistrial request by the defense. There was a situation where one of the witnesses, Earl Williams, had intimated that Mr. Ledbetter had paid for his own attorney, Mr. Williams' attorney, and then paid his own attorney to go see him. Then another witness also talked about how himself, Mr. Jones and Mr. Ledbetter would call his attorney and ask who was snitching. Ledbetter's trial counsel asked for a mistrial, which was denied. The problem with the denial is it played directly into the government's theory that Mr. Ledbetter could somehow control events from inside prison. Now the standard of course is abuse of discretion and if the prejudicial effect was so great that the jury could not disregard it. Was this elicited by the government? It was. One of them was during questioning by the defense counsel and one was during the government's questioning. I would just say that it was a serious, serious error. I see my time is up. Thank you. Good morning. May it please the Court, I'm Steve Nolder and I'm appearing on behalf of the appellant Clifford Robinson. I too would like to reserve one minute of my time. In my brief I raised five issues and I'm hopeful to reach the first two. Both involve sufficiency of the evidence as it relates to Counts 5 and 6. In Count 5 my client was charged with violating the Vicar Statute, Section 1959. An essential element that the government has to prove to sustain a conviction in 1959 is a motivational prong. And there are two pathways to prove that motivational prong. The first is that the individual sought to improve his position in the gang or to seek membership into the gang and that wasn't applicable to Mr. Robinson. The second was and that's the only one in which the jury was instructed. And in that particular motivational prong the government had to prove that a representative or an agent of the Rico Enterprise here, the short north posse, had offered a pecuniary gang to Mr. Robinson to induce him to commit the violent crime that's the subject of Count 5. And there are two witnesses who testified about the motivational prong, the pecuniary gang or independent contractor motivational prong. And those two would be Ashley Ward as well as Ms. Wilson. Ashley Ward testified that the reason that this robbery occurred at Mr. Cunningham's house in Pataskalo, Ohio on August 19, 2007 was that Mr. Cunningham owed my client money. Ms. Wilson, she testified rather inconsistently with Ms. Ward but her son, Rastaman Wilson, told her the reason for this murder was that some unknown individual informed her son, Rastaman Wilson, as well as my client, Clifford Robinson, that Mr. Cunningham had an excessive amount of money at his house in Pataskalo and that he wanted this individual robbed. That's the evidence. At no time did the government elicit any evidence that a member of the indicted RICO enterprise, an agent, a representative, induced my client to commit the Hobbs Act robbery charged in Count 5. And that is an essential element of that offense. The jury was properly instructed on this. If you look at Judge Marbley's instructions and they're found at pages I think 17,610 and 11 of the record, he properly instructed that that offer of pecuniary gain has to come from the RICO enterprise. There just simply wasn't any evidence at all about that. Was it your client's claim that he was not actually a member of the gang? He wasn't. And he wasn't charged in Count 1. And so the government never did allege that he was part of RICO enterprise. He was only charged in two substantive counts, Counts 5 and 6. That's right. So if I can then move to the next... There was evidence that Cunningham stored large sums of money there. Well, that's what this unknown individual told Rostamon Wilson as well as Clifford Robinson. There was no evidence at all as far as how much or if that in fact was true. But that certainly was the motivation that Mr. Wilson told his mother. And I'm trying to get your theory and that's not sufficient to show that he meets the elements of the crime because... The offer of pecuniary gain has to come from the indicted RICO enterprise. An agent has to make that offer to the independent contractor, my client being the independent contractor, to commit the offense. The case is Concepcion, I think, out of the Second Circuit. He has to be doing something for the conspiracy, not just for himself. That's correct. And that's exactly how the jury was instructed. So the second sufficiency, the evidence argument, reaches Count 6 and that deals with the... I think the underlying crime was conspiracy to violate the Hobbs Act and the government has to prove some effect on interstate commerce. If the individual targeted for the robbery was an individual, then it has to be a substantial effect on interstate commerce, whereas if it's a business, it's only a de minimis effect on interstate commerce. We believe the evidence clearly shows that an individual was targeted. The government in their brief at pages 82 and 85 concedes that an individual was targeted. They say Greg Cunningham was targeted for the robbery. So the burden of proof of the effect on interstate commerce has to be substantial. But the money they were going... There was evidence that the money that they were going after was... Or the jury could conclude that that was from gang activities, posse activities. It wasn't at all, Your Honor. Mr. Cunningham, if I might continue my time's up, but Mr. Cunningham, he had a business called Tap Out Entertainment. In that business, he provided dancers and he hosted bachelor parties. So the government's theory was that the money that he earned from that business was the target of the robbery. I see my time is up. Sure. Thank you. Thank you very much. Good morning, Your Honors. I'm Margaret Rabin. I represent Christopher Harris. I would like to reserve one minute of my time for rebuttal. I am also arguing regarding the sufficiency of the evidence on Counts 5 and 6. The question for Count 5, which was murder in aid of racketeering, a vicar offense, was, was the attempted robbery of Gregory Cunningham and the consequent murder of Donathan Moore in furtherance of the SS, short North Posse, enterprise? The government argues that everything these defendants did during this period of time, every crime they committed, in fact, was in furtherance of the short North Posse. But the evidence as to Counts 5 and 6 does not bear that out. Just so I'm straight, this is the same argument that your previous counsel was making? Yes. For my client. Thank you. The evidence, in that this attempted robbery and then the unfortunate death of Donathan Moon had nothing to do with the short North Posse. The evidence is that Gregory Cunningham was targeted for either he owed Robinson some money or he owed Robinson and someone else some money who wanted him robbed or because R.J. Wilson believed that there was money out there, undefined, unaccounted for, but out there. The robbery had nothing to do with this party that Cunningham had posted at his house. Nothing at all. The party started around 8 p.m. on August 17th. It was over by 4 a.m. on August the 18th. That's Mr. Cunningham's testimony. Donathan Moon and his girlfriend arrived after the party ended to stay at Cunningham's house. Around 2.30 a.m. the morning of August 19th, that's when the door is kicked in by the robbers. There is no evidence that they went out there because there had been this party. There was no evidence that they knew about the party. There was no evidence that they expected to be there. The party part here is just a red herring in the hopes that it can establish an interstate commerce nexus for what is in fact an Ohio State crime of robbery and murder. The robbers went out to rob Greg Cunningham at his home. That's why they were there. To prove that the murder was an aid of racketeering, as my prior counsel has indicated, the government has to prove either the pecuniary motive or the positional or enhancement of position motive. Either one of those would be sufficient. Either one would be sufficient, absolutely. There was evidence that he was a member of the homicide squad. Yes, but that's not why he was recruited. He was recruited because he's muscle. If you look at the other robberies... It's very fine that if somebody is well known, that someone in the gang has to maintain a reputation of being muscle? There's no evidence that that in fact was the motive. If you look at the other murders charged in here, what you find is that Ledbetter is in charge of all of this. He sets them up. He's there. He gets a share of the profits. He's the one who's organizing all the Short North Posse activities, not this one. This one, R.J. Wilson and Robinson pull in my client Harris and a non-member, non-associate named David Hurt. If this is Short North Posse, enterprise, the government makes a point that Short North Posse had all of these members and associates that they would call on who would do specific crimes. So why aren't they involved in the Gregory Cunningham event? And the answer is because it's not a Short North Posse episode. It's a freelance thing. It's a one-off. It's an attempt to collect a private debt arguably owed to Clifford Robinson. And it's got nothing to do with the enterprise or the conduct of the enterprise. Who actually killed Moon? I'm sorry? Who actually killed Moon? I believe the evidence is R.J. Wilson did. There's no evidence your client did? I do not believe so. I believe there's evidence that my client shot him first, but that he was actually killed subsequently by R.J. Wilson. He shot your, he shot the... That is the evidence, yes. And he's a member of the homicide squad of the Short North Posse? Yes. But that's not enough to say that he's increasing his position in the Short North Posse? I think there is no evidence to support that theory. That is certainly the government's argument. Thank you. Good morning, your honors. Greg Napolitano for Mr. Liston. I'd like to request one minute for rebuttal time, if I may. All right. Your honors, Mr. Knoedler did some of the heavy lifting for me relative to the Vicar requirements, and specifically the fifth element, which is what I'd like to talk with you about this morning, which is the motivation element. It's a crime that carries with it a sentence of mandatory life. And it's relevant to my client because it's the three convictions that carried with those convictions mandatory life sentences. He has four life sentences, but only three, the three that I'm talking with you about today, carried mandatory life. And so if this Court were to reverse those convictions, there is a substantive benefit to Mr. Liston as resentencing, we believe, would be appropriate. The issue here is the ambiguity of the jury's verdict. The motivational prong, the fifth element of the crime that the government chose to charge my client with. They alleged murder in conjunction with this corrupt racketeering activity. They alleged three murders. And they put on evidence to show that my client, Mr. Liston, may have been motivated by one of the two elemental motivations, either the pecuniary gain motivation, the so-called murder for hire. There's evidence in there that he bore tattoos that talked about homicide for cash. That's another one of our issues that we've briefed for you that I won't get into today, but I'd urge the Court to look at. But they put forth evidence that there was murder for hire motivation. They also put forth evidence that there was positional motivation. My client was a very young man at the time that these crimes were committed. He's still a young man, but he was just a teenager, 19, at the time that the allegations regarding the first crime was committed. And so the jury had before it, in the thousands of pages of transcript, hours and hours of testimony, evidence upon which they could potentially have concluded it was one of the two fifth element motivations. What we don't know is which of the two. You could ask the government today, Your Honor, which of the two elements, which of the two jury unanimously find, and they cannot point to a portion of the record that tells us which of the two the jury chose. And they must have chosen one. They were instructed on that, though, right? They were indeed instructed, but... Do you have a case that says if they're properly instructed, they haven't done what they were told to do because there's no special verdict? Your Honor, we've cited the cases not regarding the element, not regarding the specific crime. We've cited the cases in which the court has said, look, if a special verdict, a special instruction is given, then a special verdict form ought to follow. Wasn't that in a case where there were different sentencing effects? It was, Your Honor, and our position would be... It's not that, right? Well, it isn't. The stakes are higher here. This is an element. That was a sentencing issue, and the court said it ought to follow that the verdict should be specific. This is an element of the crime. Sentencing isn't even on that table. Sentencing was taken from the district court. We'd be making new law in that regard. Well, I don't know whether you'd be making new law. I would argue it would be potentially a clarification or an expansion of the law, Your Honor, is how I position it. But I think here the case is significant enough that it would warrant that kind of boldness by this panel. We have, as I say, three life sentences, and you cannot determine from the pitch of the two motivations this jury unanimously found, and there's a real concern. The district court had this on its radar, Your Honor. They talked at length in the charge conference about the complexity of this. The district court, at page 15842, is speaking with the lawyers about, look, it's taken us years of schooling and our careers to understand the law. This is going to be a massive undertaking for this jury. They've got to sort out the law. We've got to make this clear to them. And the jury and the district court did its level best to instruct the jury in its over 200 pages of jury instruction by transcript pages. But when we get back to the jury room, we are faced with a verdict form that contains the very same ambiguity that the court was concerned about in the first place. The conjunctive language, the or language here, makes it entirely plausible that this jury did what it could not do. It aggregated. Some thought it was positional motivation. Some thought it was murder for hire. And the government gave it evidence of both. This is distinct from some of the other defendants where they only put forth evidence of one so we could reasonably conclude what they determined. My time is up. Thank you, Your Honor. Thank you. Good morning. May it please the court, my name is Claire Cahoon and I represent Deontay Ussery, the final defendant in this appeal. I would like to reserve two minutes for rebuttal, please. Mr. Ussery is distinct amongst his co-defendants, particularly as to the issue of sufficiency for count 11, which is the murder of Dante Hill. As my colleagues have already explained, the two components of the purpose motive for Vicar. In Mr. Ussery's case, in terms of count 11, there was no evidence presented at all that this was a short North Posse positional murder or that there was pecuniary gain to the short North Posse. Now I know Judge Rogers has asked some questions about gang affiliation and I would ask this court specifically to look at the reasoning that the District Court of Connecticut applied in Jones, which is cited in my reply brief. In Jones, the court talks about Vicar and the need to go beyond just general gang affiliation. Essentially what Jones reasons is if courts interpret Vicar to establish that purpose element by simple gang affiliation, then essentially every violent crime becomes a Vicar offense if you have a gang affiliation, which Jones argues and we concur is a far too broad reading of that statute. And part of the reason we know that's true is because the statute specifically requires one of those two purposes. And I would ask this court to look at its own case law in evaluating those dual purposes as a way to distinguish Mr. Ussery's case. So for example, very recently... We only need one in the case of Ussery or we need... One of the two purposes? Correct, Your Honor. In terms of pecuniary gain, there was no evidence presented as to how that would relate back to the short North Posse. By comparison, just as recently as this November, this court decided United States versus Holt. That was another short North Posse case. In that case, this court determined that there was pecuniary gain where the short North Posse actually devised and planned the robbery and then sent the defendant to accomplish it. Those are not the facts of this case. This is a robbery in isolation. Similarly in Concepcion, which is a Second Circuit case, but one that is a significant Vicar case. In that case, the defendant was given a Rolex and money from his gang in payment for accomplishing that murder. Here we don't have any of that evidence. We have a murder in isolation with no evidence of pecuniary gain. Similarly in terms of position, under the reasoning in Jones, it would be too broad of a reading to say, well, anytime you're in a gang and you commit a murder, it increases your position. That's simply not what the statute requires. In contrast, for example, in this court in United States versus Nicholson, evaluated a Vicar count for a biker gang. In that case, there was evidence that the murder was accomplished to advance that gang member's reputation, specifically because it was a murder in retaliation on behalf of the gang. It assisted the gang in fulfilling their goals and it was something that he did specifically as retaliation as one of the gang members. Similarly in United States versus Riddle, which is a Mafia case, this court upheld that Vicar count where the murder was accomplished at the behest of the victim's position as a Mafia member. There's no evidence of any positional gain in the Dante Hill murder. I would also ask this court to look closely at the issue of prejudicial joinder, which is our third issue. It's rare that this court certainly grants issues of prejudicial joinder and frankly it's rare that as defense counsel we raise them. This is such a unique case. Deontay Ussery is charged in six counts, four counts in the superseding indictment, two joint counts, and a more than 40 count indictment, which means that Mr. Ussery is named in less than a quarter of the counts of this case. This is two months worth of witnesses, documents, testimony, evidence, largely unrelated to the charges against Mr. Ussery. Now the Supreme Court has recognized when the number of defendants goes up, the likelihood of prejudice also increases in Blumenthal and I would ask the court to consider a nap time. Thank you. Thank you. Good morning. Mary Beth Young on behalf of the United States. I am relieved they didn't get to the 16 issues as I'm sure the court is as well. So I'd like to start with a couple of the issues addressed by Mr. Ledbetter this morning. He mentioned the suppression issue. As to that, I'd just briefly comment that counsel emphasized that nervousness alone is not a reliable indicator. The district court was very sensitive to that. This is a totality of the circumstances inquiry and a key fact here is that after the officers signaled, Ledbetter made a left turn, partially pulled over like he was going to stop, but then continued on. And the officer testified at the suppression hearing that he viewed that as a big red flag because that sort of conduct in his experience was consistent with hiding something or reaching for something. So that was the situation when the court was ledbetter was turned toward the counsel. Again, conduct consistent with hiding or reaching. And although counsel notes that at least during some of the time they were able to see his hands, nonetheless facing away from an officer as part of the overall totality of the circumstances combined with the nervousness evidence provided a reasonable suspicion for believing Ledbetter was ardent and dangerous. And as our brief also argues, we do believe that this is a situation where even if there were error in this suppression issue, that error would be harmless given the nature of the evidence that was found and its limited role in the trial. The next issue raised by Mr. Ledbetter had to do with certain testimony that was the basis of a mistrial motion. The primary focus there was non-responsive testimony by witness Anthony Jones that was given not on direct examination, but in response to questioning by Ledbetter's counsel. I'd like to clarify one factual point here. Counsel mentioned this morning and Ledbetter's brief at 39 also mentions certain testimony by Jones about looking up witness names on the computer and then Ledbetter's attorney providing information about whether the individuals were cooperating. Anthony Jones did say that, but it was not in the presence of the jury. That was during counsel's faudeer of Anthony Jones after the initial comment that was stricken. So just lest the court be confused on that. Those are the facts. And as to the mistrial motion, for both of the quoted portions of testimony, Mr. Jones and Mr. Williams, there were instructions given by the district court, timely and strong instructions and we believe those were more than adequate. And also would emphasize, there's a reason the mistrial is reviewed for abuse of discretion. It matters very much the context. The district court was in the best position to understand the significance of these isolated comments in the context of a very long trial. Moving to the unanimity issue, the unanimity issue as to, as between the two purposes on Vicar counts. This is raised in briefing by Harris, Liston and Usry. And as to this, several points defeat this argument. Defendants recognize this is being reviewed only for plain error. They did not object to the verdict forms that were used. They did not propose a verdict form that would have specifically identified which of the two purposes the jury found. And there are no cases requiring a special verdict or interrogatory for the statute. Special verdicts are generally disfavored, so as a backdrop it would be very difficult to find plain error in not using one when no one asked for it. And most important perhaps, the jury was instructed that the government had to prove the murder was committed for either one of the two stated purposes, but your verdict must be unanimous as to which purpose. Given the presumption that juries follow their instructions, that instruction ensured that the jury was unanimous. And we don't believe there's any error, much less plain error on that issue. As to the sufficiency of the evidence regarding those purposes, which several counsel have mentioned this morning, this comes up in the context of count unexplained, there are two alternative purposes under the Vicar statute, the pecuniary purpose and the positional purpose. The pecuniary purpose looks to whether the offense is committed in exchange for anything of pecuniary value from an enterprise engaged in racketeering activity. Now, there's been some use this morning of phrases like offered from or induced by, and that's not in the statute. It's not in the statute. It's as consideration for anything of pecuniary value from an enterprise. Now here, no one is challenging for the purposes of this appeal that S&P, Short North Posse, and its associates are an enterprise engaged in racketeering activity. The question is whether there was sufficient evidence of this required statutory purpose. And I'll focus first on this pecuniary value purpose. Now, both of these counts that are at issue were essentially failed robbery attempts, or at least the jury could have so concluded. As to count 11, the murder of Dante Hill, there was evidence supporting a conclusion that usury was trying to rob Hill in someone else's driveway. And it was meant to be a marijuana deal. Usury was ostensibly coming to sell marijuana to Dante Hill. But there was evidence to support a conclusion usury instead tried to rob him, and the jury could therefore conclude he was motivated by pecuniary value in the form of the robbery proceeds. Doesn't that have to be pecuniary value from the enterprise? It does. I'll get there. That's what I'm having trouble with. Everything you say makes sense, but it can't be that you were robbing somebody and you got pecuniary value from the person you're robbing. You have to get pecuniary value from the Short North Posse, right? Yes, yes. Where is that? So the reason is similar for both of these counts. That was the count 11 involving usury. Count 5, briefly, was another robbery. This was the robbery of the in-home strip club, if you will. So again, a robbery attempt. So pecuniary value in the simple sense of we're trying to rob someone. But your Honor is absolutely correct that more than that is required. It has to be pecuniary value obtained from the enterprise. And the reason why What would be a paradigm example of that? What would be a natural? So this statute sometimes applies. It's sometimes applied, and I think counsel has used the phrase, murder for hire. But that's not really from the statute, but it is a factual circumstance. You go out and do something that the enterprise has paid you to do. Yes, so that's one circumstance. You're actually, take it out of the robbery context, it becomes a little more straightforward. Think of a non-pecuniary offense. They hire you to go and rob a bank, and then you split it with them. Just so. That would fit. Just so. Where is the evidence of that with respect to Robinson-Harrison, and in particular usury? Well, this is certainly not that scenario. In a robbery scenario, there's pecuniary value other than otherwise involved in the offense. And for example, the Eastern District of New York in Wilson, which we cite in our brief, had a robbery scenario and made the point that the statute doesn't talk about something for hire. It talks about pecuniary value. It has to be from the enterprise. Yes, Rob. If you rob someone, it's not from the enterprise, right? That's correct. In this case. Where is it from the enterprise? In this case. Go back and define pecuniary. I know what pecuniary means. In this case, the reason that this can be treated as from the enterprise is similar for both these two counts. To start, they were committed, at least in part, by Homicide Squad members. This was a core activity of the Homicide Squad, committing robberies of this sort. Looking at Mr. Usury's count, Usury was participating in this robbery in the same year, 2007, in which he had the jury-edited evidence of two other similar robberies that he had committed with others in the Short North Posse. So this was a core activity for both of these. In count five... By core activity, you mean it was the same kind of activity? Yes. In fact, it's a purpose. This particular enterprise... So are you basically saying if you rob for a gang, then any time you rob, it's for a gang, it's for the same gang? Not necessarily, Your Honor. Why isn't that here under your argument? So for one, this particular gang, the evidence showed an indictment charged that a purpose of the gang was to engage in robberies of this sort. That would not be the case for many gangs. Second, had he gone, for example, geographically elsewhere or a different kind of target, these were both cash-rich targets. They're both within the core purposes of this particular gang. This situation parallels... It's enough evidence for the jury to conclude under instructions that no one is challenging that yes. Here, if you consider the... I can see how that might work for the reputational or positional argument. It's a little hard to work for the pecuniary gang argument, isn't it? Well, if you think about, for example, Mr. Robinson, who is the only one who was not alleged to be a member of the Short North Posse. Mr. Robinson, in order to effectuate this robbery, participated with the Short North Posse. The proceeds of the robbery are proceeds he would not have obtained without the Short North Posse. If you look at the whole decision, which this court issued for another defendant, indicted together... Like you're stealing money that the Short North Posse claimed was theirs in the first place. Is that the idea? The money that was stolen in count five was from this business strip club. It was not originally Short North Posse money. How can you compare it to a situation where they're in effect hiring somebody to recover something for them? I'm not necessarily trying to compare it to that situation. I'm trying to compare it to the language of the statute. The language of the statute says from the enterprise, right? It does, Your Honor. How does it fit within that? If you imagine that the Short North Posse had an engagement letter that said, we are happy to assist with your violent robberies. In exchange, we will anticipate receiving a proportionate share of the proceeds of any robbery, any successful robbery. Okay? And suppose Robinson says, that sounds good. Let's get them to assist. And they go, and they do the robbery. And then they sit down and split the proceeds. What Robinson got would be, and we think the Holt case really is very close to this, in that those proceeds would not have been obtained absent the enterprise's participation. If you're an outsider and you enlist a racketeering enterprise for your pecuniary purpose, we believe that's within the statute. How does Ussery fit within that? Ussery? Ussery is not raising, well, okay, he is on count 11, the different robbery, yes, Your Honor. Ussery himself is a member of the enterprise. He's participating, and courts have made this point, especially for an association, in fact, informal enterprise. How the enterprise acts is through its members. As a member of the enterprise, he's committing a robbery. So perhaps for Ussery, the more straightforward way of viewing this is with the positional motivation, because he's acting consistent. It's kind of hard to fit him under the, under the, I don't mean the. We do think, we do think, no, we do think it applies, because one has to almost view Ussery as compensating himself, if you will. Ussery as agent for the enterprise doing the robbery. The positional prong is straightforward, we think, for Ussery. Remember, Ussery, after this offense, well, he's not only doing something within the core purposes of the enterprise. After, he tells people about it. He tells the other guys, you know, what happened. There's two cooperating witnesses testifying that he. He bragged about it to the members of the. I don't know if bragged is the right word. But he recounts the incident. And that is consistent with. Reports back, in other words. Yes. Yes. So that's how you would distinguish it from saying every time any gang member. Yes, we certainly do not take the view that has been attributed to us. That if you're in a gang, anything you do while you're in the gang is going to be attributable to the gang. Okay, that's fine. It has to be consistent. That's admirable. Let's assume you're correct. How is this different from that? The one way that it's, the only way that it's different is that he goes back and reports? Or is there any other evidence? He reports back. He is robbing a drug dealer. Which the evidence showed and the indictment charged was a core purpose of this enterprise. He. Things that are in the core purpose of some other enterprise. That could easily happen to somebody, right? If you're good at, I don't know, breaking into banks. And you're in a gang that breaks into banks. You can go off on your own and break into another bank. That doesn't mean you're doing it to improve your position. Or does it? Does that just automatically mean that. No, I think it's a fact specific question. It's a question for the jury. The jury was instructed, as everyone agrees, properly. And the overarching context. Because the. I'm trying to ask how we would distinguish the case that you say you are not arguing. Yes, okay. I don't see anything here other than they reported back. Is there anything else? You say the core purpose. Nature of the target. Similarity to usury. Other offenses. Close in time. Committed with others. Must suggest that he was doing it to improve his standing within the organization. Can be fairly interpreted to do so by a rational jury. Yes, your honor. Just one more moment on this issue. At the risk of self-flagellation. I would encourage this court to look carefully at the Holt opinion. Because Holt, like Robinson here, was not a member of the enterprise. This court nonetheless concluded that Holt. That there was sufficient evidence of the pecuniary motive as to Holt. And that the United States would identify that the offense at issue in Holt. And the offense at issue here in count five. Are similar but for who came up with the idea. And in the United States view. That cannot determine the applicability of Vicar. Once the enterprise is involved. Whether the enterprise first suggested this to others. And they came along. Or the others suggested it to the enterprise. Is not a distinction that matters to the statute.  You enterprise come, I will come. We will get mutual proceeds and we will split them up. There's an exchange either way. I'm going to quickly mention one issue that has not been mentioned this morning. And that's the vagueness issue. Which was argument six in the United States brief. This is the issue as to which certiorari is granted. So I just wanted to remind the court of that backdrop. The United States did not ask for the case to be held in abeyance. Given that the issue is raised by only two of the five defendants. And there's plenty of other issues for the court to be looking at. But the case United States v. Davis is being argued. April 17th in the United States Supreme Court. And we assume that the panel will be mindful of that in planning its work. In the normal course that would be decided by July. Late June. That issue pertains to count six. And there's another issue that pertains to count six. Which was argued this morning by Mr. Nolder. As to Mr. Robinson. And that's the commerce clause point. Count six is one of the two regarding the robbery of the strip club. And as to count six. Which again has this demia issue. Vagueness issue that's being resolved by the Supreme Court. But after they rule in the United States' favor. Then the court will need to address this commerce clause issue. The disagreement at the threshold is whether the standard for a business should apply. Or the standard for an individual. The United States has argued this is a business. It's a business in a home. But it's a strip club. This is evidenced by there was a party there for customers the night before. Counsel says, well, this has nothing to do with that party. Well, at the least it's illustrative of the fact that this is a business. We have evidence in the record that Hurt was told. Hurt was the driver for that offense. Was told by Rostam and Wilson in kind of recruiting him. This guy owns a strip club. So the target. And it's a little slippery because it's not a sort of formal business. Greg Cunningham was the owner. Tap Out Entertainment was the business. The reason they're going. There is evidence to support. Has to do with they know he has money. They know he owns a strip club. We think the most straightforward way of dealing with that is this is a business. The de minimis standard applies. There are dancers from out of state. There are customers from out of state. The de minimis standard is satisfied. But even if you view the target as the individual. He's being targeted because he owns a business. So just like drug dealers. Just like in the Supreme Court's Taylor decision. That satisfies that standard as well. By showing a connection between the individual and a business engaged in interstate commerce. That is substantial. Not fortuitous or speculative. Unless the court has questions. I believe I may be done. Very well. Thank you. Thank you. Your rebuttal. Thank you, Your Honors. On behalf of Mr. Ledbetter, very briefly in rebuttal. I would just add to the motion and Mr. This trial is cited in the government brief on page 162. In front of the jury during cross-examination by Mr. Ledbetter's trial counsel. Witness Jones said would they believe if I say that you gave information that probably got Crystal murdered. And that was Mr. Ledbetter's girlfriend who was murdered and allegedly executed. And the theory was that Mr. Ledbetter who was locked up in prison was somehow able to control people and have her murdered while he was in prison. And that goes to what he said the jury heard, what the witness said the jury heard. And they could have easily inferred that Mr. Ledbetter was controlling his trial counsel. And that somehow was related to the murder of Fife. Thank you. Thank you. Briefly about this business Tap Out Entertainment that Ms. Young had identified during her argument. I would take issue with the fact that this business was something that engaged in interstate commerce. Mr. Cunningham was the operator of the business. He was asked pointedly by me several times the number of parties he hosted in the month of August. Which was the month where this murder for hire incident happened. He said one. The night of the incident was August 17th. He couldn't remember at all how many parties he had hosted the entire calendar year of 2007. So I take issue with the fact that this business customarily or routinely engaged in. How many he couldn't remember or he couldn't remember any? He just said I don't know. And also I would note that after I got finished cross-examining Mr. Cunningham, the assistant U.S. attorney stood up and asked him, did you sell cigarettes to the patrons? No. Did any of the businesses where you hosted, because he hosted parties off site too, did any of the businesses where you hosted parties, did you provide liquor to the patrons or to the dancers? Obviously the reason being is they wanted to show some impact, maybe de minimis impact on interstate commerce through the alcohol or cigarettes. And he said no to that as well. Thank you very much. Well, it was nice to hear the government confirm my theory about count five. And that is that if the purpose of short north posse is to rob people who have money, then every robbery by a short north person is not in furtherance of the enterprise. And it's important to remember there was no money stolen in the count five robbery. They never found any money. Mr. Cunningham never testified that there was in fact any money at his house that night. There's enough evidence to believe that the purpose of going there was to get money. Oh, absolutely. Yes. And the engagement analogy that the government used, you will see that in all of the other robberies where Ledbetter is involved in setting them up, making sure he gets a share of the profits, the whole enterprise thing, you don't see it here. And that's why the count five robbery is outside of the purposes of the enterprise. Thank you. Your Honors, regarding unanimity, you heard the government talk about special verdicts being disfavored. You heard the government talk about plain error review. You did not hear the government tell you what my client's motive was as unanimously found by this jury, an element of the crime of conviction. We stand here before you today with three convictions, and the government didn't do that because they can't do that, because the record will not tell us that. We must assume it. It will not tell us which one the jury unanimously decided. That is correct, Your Honor. Is that the way it works when you have that? Your Honor, it must be one or the other. And the unanimity is required. It doesn't mean we need to know which one it was, does it? I'm sorry? It doesn't mean we need to know which one it was. We need to know with certainty that the jury was unanimous as to one. We don't need to know which one it was. We need to know it was unanimous as to one. That's correct. It could be one or the other. There's a lot of evidence that they did that because they were so instructed. Well, as to that, if I could answer your question, counsel read one sentence relative to this, or actually two. It's cited in our brief at page 16, and they work together. I will read the two sentences. The government need only prove that the murder was committed by the defendant for either one of two stated purposes, but your verdict must be unanimous as to which purpose. That's what the government read to you. The next sentence says, if you find that the government has proven the defendant acted with one of these two alternative purposes, this element is satisfied. I think that blunts the effectiveness of the prior sentence. It doesn't literally. Maybe to someone who's confused it might. And the jury may well have been confused. Thank you. Just briefly, as to Mr. Ussery, I'd like to clarify this issue of the positional element. This court has already explained in Hackett that it must be the animating purpose of the offense to maintain or increase your position in the gang in order to satisfy that purpose. The government has not pointed to any case, nor can it, that supports the general gang affiliation is enough. Now, the government says, well, he bragged about it. And I would ask the court to look at the record because that's not correct. The evidence was that he told two other people who were not Short North Posse members that he had committed this offense. If this court credits that testimony, there was no evidence presented that that was reported back to the leadership of the Short North Posse or that that somehow increased or maintained his position based on the government's allegation that he was a gang member. In addition, the government also- Just because they were not gang members, is that the reason you're saying? They were not gang members, and there was no evidence presented that folks in the Short North Posse were informed of that information or that it in any way impacted Mr. Ussery's position if this court assumes that he is a member of the gang. Further, contrary to the government's representation, Dante Hill, who was the unfortunate victim, was not a drug dealer. He was actually at Mr. Broomfield's home to purchase marijuana. So if the government's argument is, well, their M.O. is to rob drug dealers, this would not fit into that description. And further, the case law. The case law is really what guides this court in the interpretation of Vicar. And, in fact, the cases that the government cites largely from the 11th Circuit and the D.C. Circuit also have distinguishable facts where there is clear evidence that the act is tied to that defendant's maintaining or increasing their position. For example, in McGill, which is a D.C. Circuit case, this is another murder offense, and the argument that this increased his position was because he committed the murder in front of other gang members who were below him on sort of the drug trafficking food chain. And so by committing that murder in front of those younger crew members, that helped him to maintain his authority inside the gang. Here we have no evidence of that. Was he the one who said things got out of hand? I apologize, Your Honor? Was Ussery the one who said things got out of hand or they got... The testimony from witnesses was that he told Mr. Broomfield, things went bad, I never got there. Because he had testified, or excuse me, Mr. Broomfield's testimony had been that my client told him, I'm not sure I can get a ride, I'll try to get there if I can. And that subsequently he said, things went bad, I never got there. Who was Mr. Broomfield again? Mr. Broomfield was the resident owner. Mr. Hill was killed in the driveway of Mr. Broomfield's home. Mr. Broomfield's not a member of the gang. Correct, Your Honor. But he is a known drug dealer. He is a what? A known drug dealer. And in fact, Mr. Broomfield's testimony at trial was he thought it was very possible that whoever killed Dante Hill might have been there actually to rob him, and Mr. Hill had the unfortunate luck of being there in the wrong place at the wrong time. Thank you. Thank you. Well, I think that completes the arguments. The case is submitted. And once the table is clear, the next case can be called.